**W. R. BONSAL COMPANY, Plaintiff,**

v.

**UNITED STATES,**
**Defendant.**

**Civ. No. 1188.**

United States District Court
W. D. North Carolina,
Charlotte Division.

March 13, 1959.

Taylor, Kitchin & Taylor, Wadesboro, N. C., H. P. Taylor, Jr., Wadesboro, N. C., on the brief, for plaintiff.

C. Guy Tadlock, Acting First Asst. Atty. Gen., Lyle M. Turner, T. D. Taubeneck, Dept. of Justice, Washington, D. C., James M. Baley, Jr., U. S. Atty., Asheville, N. C., William J. Waggoner, Asst. U. S. Atty., Charlotte, N. C., for defendant.

WARLICK, District Judge.

This is an action by plaintiff for a claimed refund on corporate income and excess profits taxes, admittedly paid by it as shown in the return for its fiscal year beginning September 30, 1950 and ending September 30, 1951. The court has jurisdiction of this suit under 28 U.S.C. § 1346(a) (1).

The sole question presented is: Has the plaintiff established that, during 1950 and 1951 the deposit from which it obtained its income was "quartzite" so as to entitle it to a deduction under Sec. 23(m) and Sec. 114(b) (4) (A) (iii) of the Internal Revenue Act of 1939, as amended by Sec. 319 of the Internal Revenue Act of 1951, effective January 1, of that year. 26 U.S.C. §§ 23(m), 114(b) (4) (A) (iii).

The case was tried without a jury and in line with Rule 52 of Federal Rules of Civil Procedure, 28 U.S.C., the following facts are specially found.

Plaintiff is a North Carolina corporation having its principal place of business at Lilesville, in Anson County, and reported its income and filed its tax returns for the period in question with the Collector at Greensboro, North Carolina, and duly paid the tax reported on said return. Plaintiff's business is that of mining the minerals and deposits from the lands which it owns in that section of North Carolina, embracing some five or six square miles, and has been so engaged in this mining project for many years.

For the fiscal year ending September 30, 1951, the plaintiff in its original tax return, deducted $4,729.10 in arriving at

its net taxable income as an allowance for depletion, at the rate of 1¢ per ton, which was the allowance prior to the enactment of the later applicable laws, as shown herein,—and on October 6, 1952, following the change in the law relating to depletion, for quartzite and other minerals mined therein, duly and properly and within the time set out by law, filed its claim for a refund with the Director of Internal Revenue for North Carolina. That more than six months had elapsed since filing said claim for refund. On January 25, 1956 the Commissioner, after recomputing plaintiff's tax, under the claimed refund, notified plaintiff that an allowance had been made to it of $23,-077.11, on said claim, which amount was accordingly paid on May 15, 1956. This allowance by the Commission being for depletion at the rate of 15% on that part of plaintiff's product sold for metallurgical purposes during that portion of its fiscal year from January 1, 1951, to September 30, 1951, thus classifying such when sold for metallurgical purposes as "quartzite". In that sale plaintiff disposed of 77,681.03 tons for a gross income of $102,234.62. However during the same period plaintiff quarried and sold 395,229.09 tons for a gross sales price of $421,190.30, for road building and other construction purposes, and on this gross income the Commissioner allowed plaintiff a depletion of 5% on the assumption that this material was sand and gravel and not quartzite, obviously using the end-use test in arriving at the allowances made under the demand for refund. However, the parties hereto now agree that the end-use test is not to be applied here as Congress made no such authorization in the statute and to undertake to effect such method disregarded the rates set out in the law for such depletion. Virginian Limestone Corp. v. Commissioner, 26 T.C. 553. Similar holdings have been subsequently made in other cases.

During the year 1951, the Internal Revenue Code was amended, effective January 1, 1951, to permit a 15% depletion for quartzite and other minerals which were embraced in that amendment to said code.

At the same time sand, gravel, granite, marble and other allied substances were given a 5% depletion.

From the decision on the part of the Commissioner in failing to accept plaintiff's designation of its minerals as quartzite, this controversy springs. The amount sought herein lies between the 5% allowed for sand and gravel and the 15% as allowed for quartzite. The amount of money that may be ultimately involved is of no concern as counsel has stipulated that in the event of a judgment in plaintiff's favor, the amount can be determined when a recomputation is had.

Let us then see just what we are dealing with.

The plaintiff contends that all of its mining income was from quartzite and subject to a 15% depletion. The defendant contends that plaintiff received all of the depletion allowance to which it is entitled for that its deposit was nothing other than sand and gravel, in the ordinary, commonly understood, meaning of those terms,—the only appropriate test if the end-use test is abandoned; inferring, to say the least, that a mistake was made when the deposits sold by plaintiff for metallurgical uses were classified as quartzite, by the Director.

Evidently Congress in dealing with quartzite in the depletion schedules was regarding it in its commonly understood commercial meaning and not as a geological term. That conclusion would certainly be justified since the subject being dealt with is on a commercial basis. But whether one accepts the geological or the commercial definition of the term, the same answer must be given to the question involved. In the commercial industry quartzite is defined as "a rock and a rock is an aggregate of minerals". The commercially understood meaning of quartzite is that it is a material of very high silica content, well above 99%, and the material also must have a satisfactory physical structure,—in other words,

be sufficiently resistant to mechanical handling and likewise sufficiently resistant to the sudden temperature changes that it must encounter when charged in electrical furnaces. Again it was spelled out in the evidence geologically as meaning, "quartzite is a mass of sedimentary, originally sedimentary rock, composed essentially of particles of sand which are firmly cemented with silica cement so that now it is a hard impervious rock that breaks across the sand grains and not around them". "In other words it has been metamorphosed". It is incontroverted that it is an unfriable rock that is very resistant to very high temperatures, sudden changes in temperature, and chemical reagents. It is also a substance of low porosity.

The following are the two applicable statutes:

"(i) In the case of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromide, 5 per centum,

\* \* \* \* \* \*

"(iii) in the case of metal mines, aplite, bauxite, flourspar, flake graphite, vermiculite, beryl, garnet, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ball clay, sagger clay, china clay, phosphate rock, rock asphalt, trona, bentonite, gilsonite, thenardite, borax, fuller's earth, tripoli, refractory and fire clay, *quartzite*, diatomaceous earth, metallurgical grade limestone, chemical grade limestone, and potash, 15 per centum."

Plaintiff having the burden of proof offered the testimony of fourteen witnesses, some of whom were officers, others production engineers, and employees of many of the industrial giants in America. Others who are teachers in outstanding technical colleges and universities and some who hold positions as geologists with the various states, and each of them gave it as his opinion, based on the examination of plaintiff's product, that within the commonly understood commercial meaning and the uses for which the product was susceptible, that it constituted quartzite of the best type and the highest grade. Many of these witnesses used plaintiff's product in fields of metallurgical, chemical and refractory operations. That all of the products from plaintiff's operation are mined and processed in the same manner and after being mined, washing is the only process through which the properties are put. In addition much of the plaintiff's product is sold direct to the North Carolina and South Carolina Highway Departments, to the general construction industries, to railway companies for use as ballast on their tracks, to the ready-mix concrete industry, and to contractors engaged in construction work generally.

The defendant introduced the testimony of three witnesses of outstanding ability in their fields, whose evidence was directly in opposition to that of the testimony offered by plaintiff and through whose testimony and other evidence presented, the defendant insists that the deposits mined by the plaintiff are no more than sand and gravel and substances of like character, and certainly not quartzite.

The trial was somewhat lengthy. I listened attentively to the evidence as it was offered by witnesses, who testified in person and to the depositions of others read in the trial, and have carefully reviewed the whole of the record since it came to me for decision.

North Carolina is one of the few American States whose soil does not contain any merchantable deposits of oil, coal, gas, silver, or gold, or other valuable minerals which have made other states wealthy from the mining of such products. It is rich in tradition and heritage but poor in its mineral resources. However it does have in its soil unestimated values in certain minerals. The great progress made by industry through discovery and other

means, has seemingly just begun to tap for use some of the lesser mine deposits of the State, and consequently quartzite and its varied uses is now a mineral of worth.

As early as 1856 the State Geologist of North Carolina Ebenezer Emmons, in his work entitled "Geological Report of the Midland Counties of North Carolina" stated

"The rocks referred to, as belonging to the oldest known sediments, belong in part to the Midland Counties. They are slate and quartzite mainly, and their sedimentary origin is based mainly upon conformable pebbly beds. Siliceous rocks which have been called quartzites. It is a formation which was described as long ago as 1824 by Professors Olmsted and Mitchell, both of whom understood its importance."

Through the intervening years from various analyses made, reports have been given to the State of the value of its mineral products. Some years back Mr. Herman J. Bryson, State Geologist, wrote a publication which was issued by the North Carolina Department of Conservation and Development entitled "The Mining Industry in North Carolina during 1927 and 1928" and which in considering the deposits of Anson County, and discussing these particular deposits under investigation in this case, had this to say:

"The gravel is a high grade material consisting of quartz and quartzite pebbles mixed in sand and clay. The pebbles range in size from three inches in diameter down to fine sand."

It has always thus been so recognized and regarded.

I therefore come to the conclusion and so find that in the refractories industry, and the metallurgical industry, all of the natural deposits removed from the plaintiff's mine and sold during the taxable year herein were quartzite within the commonly understood commercial meaning of the term.

That all of the natural deposits removed from the plaintiff's mine and likewise sold during said taxable year to the road building and allied industries were quartzite within the commonly understood commercial meaning of the term as defined by Congress. That in my opinion and I so find, according to the mineralogical, petrological, geological and chemical classifications of these natural deposits which were removed from plaintiff's mine and sold during the taxable year were quartzite within the meaning of Sec. 114(b) (4) (A) (iii) of the Internal Revenue Code of 1939 as amended by Sec. 319 of the Revenue Act of 1951, and as such entitle plaintiff to a 15% depletion rate.

Counsel will present judgment carrying into effect these findings and conclusions.