**SOUTH JERSEY SAND COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

No. 12806.

United States Court of Appeals
Third Circuit.

Argued March 17, 1959.

Decided June 4, 1959.

Rehearing Denied June 26, 1959.

George Craven, Philadelphia, Pa. (Converse Murdoch, Philadelphia, Pa., on the brief), for petitioner.

James P. Turner, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before McLAUGHLIN and HASTIE, Circuit Judges, and MORRILL, District Judge.

McLAUGHLIN, Circuit Judge.

The only issue before us in this tax case is whether the petitioner mined quartzite, which would entitle it to a 15 per cent depletion deduction, or sand, which would call for a 5 per cent deduction. Section 114(b) (4) (A) Internal Revenue Code of 1939, as amended by Section 319 Rev.Act 1951, 26 U.S.C.1952 ed. Section 114. The taxable years are 1951, 1952 and 1953.

During the period involved petitioner mined or dredged sand from deposits near Dividing Creek, New Jersey. The process consisted of removal of the top soil, etc., until the sand was exposed. Dredging removed the sand through pipe lines to screening stations. After screening and washing it was transported to concrete storage silos where it was stored and dried. The sand was then sold to a distributor who further processed it and sold it to glass manufacturers principally. The primary chemical content of the sand, 98.98 per cent, was silicon dioxide. This, plus its low iron element, 0.151 per cent, made it useful for glass manufacture. The sand has the crystallographic structure of quartz and is angular in appearance. It is the result of disintegration of a type of rock formed, through the cementation, by a silica cement, of sand grains.

Petitioner's main argument is that its expert characterized the sand as quartzite and since that was the only evidence on what it calls a question of fact, it should prevail.

It is true that the witness, in his opinion, classified the cobbles, pebbles, granules and sand which he found in deposits of the petitioner sand company as quartzite. However, immediately thereafter, still on direct examination asked to "* * * give us the defintion or general meaning of the term, 'quartzite,' he answered:

"I would say that the definition which is generally accepted by geologists is that quartzite is a rock composed essentially of quartz, which is formed from a sedimentary sandstone by the introduction of a silica cement. This silica cement is often in crystallographic continuity with the original quartz in the sedimentary rock."

Still later he stated that the sand was included in the common commercial meaning of quartzite and "This sand also adheres to the technical—the technological definition of quartzite." He agreed that the correct diameter of sand is from .06 to 4 millimeters. He said that sand had no meaning apart from the size of the particles and that "Sand is a grain size of material derived from rock. That is, it is an inorganic, naturally occurring material, a rock which is produced into the size of sand." As to the petitioner's sand, he said, " * * * it still retains the characteristics of quartzite, that is, the aggregation of quartz grains." Counsel, stating petitioner's position, told the Tax Court, "I have always contended that this is quartz sand which is quartzite, and I now so contend."

■ The depletion allowance is a matter of grace.[1] The allowances we are here dealing with are 15 per cent for quartzite and 5 per cent for sand. The product South Jersey Sand Company mined and marketed was admittedly sand. While the expert's definition, above quoted, of quartzite would not seem to include sand, nevertheless he says it does, and that the sand would also be included in the commercial meaning of quartzite.

■ Had the Tax Court's decision turned on the acceptance of the expert's opinion, having in mind that it was the taxpayer's burden to establish the rightness of its contention,[2] from our own review of that evidence there is ample justification for the Court concluding that

" * * * his testimony is not satisfying that petitioner's product is commonly or commercially referred to as quartzite. * * * We were far from convinced by his testimony that such sand is in fact commonly or commercially known and referred to as 'quartzite'."

■ But the Tax Court's decision cuts far deeper than that. As it stated: "The Court is not compelled to rely on petitioner's witness in discovering the sense in which Congress used certain words." That, we think, is the nub of this case. We are here dealing with and guided by what Congress meant by its unmistakable affirmative distinction between quartzite as such and sand. We are seeking the commonly understood definitions of the terms.[3] Aside from the statement of the expert, the record is bare of any indication that commercially the rock quartzite is merely industrial sand because of similar chemical content. The circumstance that quartzite may be reduced to sand prior to being used in the glass industry does not reflect Congressional acceptance of the two products as identical. The statute allows the fifteen per cent depletion for quartzite not for glass manufacturing substances.

The legislative history reveals an understanding and awareness of the classification of sand and gravel by themselves as basic materials; that pure silica sand (as before us) is the principal constituent of glass. (Testimony of the chairman of the National Sand and Gravel Association, 1 House Hearings, Revenue Revision of 1950, p. 311). The next year, 1951, the chairman, again as a witness,

1. Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347.

2. New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348.

3. The Senate Finance Committee in reporting on paragraphs (i), (ii), (iii) of Section 114(b) (4) (A), (i) of which includes "sand" in its 5 per cent depletion allowance and (iii) of which includes "quartzite" in its 15 per cent allowance, states "The names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning." S. Report No. 781 82nd Cong. 1st Sess. p. 38. And see United States v. Wagner Quarries Company, 6 Cir., 1958, 260 F.2d 907, 908; Virginian Limestone Corporation v. Commissioner, 1956, 26 T.C. 553, 560. In Quartzite Stone Co. v. Commissioner, 1958, 30 T.C. 511, 517, the court said, "Our concern is not with the classic definition or scientific theories concerning the term quartzite but with the commonly understood commercially acceptable meaning of the term."

sought specifically to raise the depletion allowance for sand and gravel and industrial sand from 5 per cent to 15 per cent. (House Hearings, Revenue Revision 1951, Part 3, pp. 1539–1545). See also Senate Hearings, Revenue Act 1951, Part 2, p. 885. It is a fair evaluation of those hearings with respect to sand and gravel, particularly industrial sand, that they were considered as completely separate materials with not the slightest indication that they were to be classed or confused with quartzite. Actually at the 1953 House Hearings, General Revenue Revision, Part 3, p. 2071, a representative of the quartzite industry testified that quartzite is " * * * a firm compact rock composed of grains of quartz so firmly united that fracture takes place across the grains instead of around them." The entire legislative history shows, silicon sand and generally sand and gravel to have been accepted in the one group, small separate grains; and quartzite by itself, a compact granular rock, which as such during the critical years was awarded a higher depletion allowance than loose sand and gravel. And we find nothing in the later Section 613 of the Revenue Code of 1954, 26 U.S.C.A. § 613, or its history that lends comfort to petitioner's view that its industrial sand is quartzite.

All ordinary definitions of quartzite and sand stress the visible, readily discernible dissimilarities between the two. Quartzite, the hard compact rock. Sand, hard small grains. There is no attempt to merge the one into the other. See Webster's International Dictionary (2nd Ed. 1950); Encyclopedia Brittanica, 1952 Ed.; a Glossary of the Mining and Mineral Industry, Bull. No. 95, 1947, Bureau of Mines, Dept. Interior We have neither seen nor has our attention been called to any common or industry usage which attempts to eliminate this very real visual distinction between quartzite and industrial sand.[4] The Commissioner and the Tax Court were bound by the 1939 depletion statute. Any relief from that for industrial sand was a matter for the Congress.

The decision of the Tax Court will be affirmed.

---

4. In W. R. Bonsal Company v. United States, D.C.W.D.N.C., 171 F.Supp. 278, 279, the district court in a memorandum opinion upheld plaintiff's contention that all of its mined product was quartzite against the government's assertion that it was sand and gravel. The court categorically agreed that "Evidently Congress in dealing with quartzite in the depletion schedules was regarding it in its commonly understood commercial meaning and not as a geological term." The opinion states that each of a number of witnesses for the plaintiff *gave as his opinion* that plaintiff's product was quartzite and that the defense evidence was directly in opposition. Great reliance seems to have been placed by the court on two reports of former state geologists of North Carolina. The first, in 1856, speaking of rocks in the Midland Counties of North Carolina, identifies them as "Siliceous rocks which have been called quartzites." The second title "The Mining Industry in North Carolina during 1927 and 1928" discusses the deposits of Anson County which were before the court and has this to say of them: "The gravel is a high grade material consisting of quartz and quartzite pebbles mixed in sand and clay. The pebbles range in size from three inches in diameter down to fine sand." The court comments on this: "It has always thus been recognized and regarded."

Without having the full record of the case we cannot of course discuss it in its entirety. However, it is apparent that the industrial sand presently before us is not within the 1856 report definition of quartzite approved in Bonsal. It is also clear that the second North Carolina report, dealing with the very product before the court, made a sharp cleavage between even gravel consisting of quartz and quartzite pebbles and sand and clay, though in the next sentence it would seem to classify pebbles as sand, contrary to both geological and commercial classifications. The Bonsal facts may well be distinguishable from the case at bar. If they are not, in our view, the decision fails in its construction of the 1939 depletion statute.