**UNITED STATES of America,**
**Appellant,**

v.

**W. R. BONSAL COMPANY, Appellee.**

**No. 7992.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 11, 1960.

Decided May 31, 1960.

Joseph Kovner, Atty., Dept. of Justice, Washington, D. C. (Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D. C., J. M. Baley, Jr., U. S. Atty., Asheville, N. C., and John E. McDonald, Jr., Asst. U. S. Atty., Charlotte, N. C., on brief), for appellant.

H. P. Taylor, Jr., Wadesboro, N. C. (Taylor, Kitchin & Taylor, Wadesboro, N. C., on brief) for appellee.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The question is whether the tapayer's product is quartzite, for which there is a depletion allowance of 15% for income tax purposes, or sand and gravel, for which the depletion rate is 5%. In an action for refund of income taxes for the fiscal year ended September 30, 1951, the District Court found that the material was quartzite and that the taxpayer was entitled to depletion at the rate of 15%.

In Anson County, North Carolina, there are unique, but extensive sedimentary beds of pebbles having the characteristics of quartzite. Elsewhere, quartzite is usually found in more massive formations, but here it is in the form of pebbles that range in size from a fraction of an inch to several inches in diameter. The quality of these hard, dense stones is exceptionally high and uniform, so that, out of these beds, the taxpayer is able to meet metallurgical specifications requiring a minimum silicon dioxide content of 99%.

The taxpayer removes this material from the beds and, in its plant, screens and washes it to remove clay and to grade the remaining material according to the size of the pebbles. It then sells the material to the metallurgical industry for use in making silicon-rich alloys, to the refractory industry for use in making fire brick, to industrial chemists for use in filtration plants, to railroads for use as ballast and to the construction trades for use as a base for highways and as an aggregate for concrete.

The railroads purchase the material as "ballast"; the highway departments of North and South Carolina and the construction trades purchase it as "gravel," or, in the finer grades, as "sand." Obviously these purchasers are interested only in the physical properties of the material, the fact that the pebbles are hard, dense and not friable. Those purchasers who are more concerned with the chemical and mineralogical properties of the material purchase it as "quartzite," "silica gravel" or "silica pebbles."

In the District Court, the primary contention of the Commissioner was that the material was vein quartz, rather than quartzite. The Commissioner offered two experts who gave their opinion that the material had originated in veins of quartz. Expert witnesses for the taxpayer gave their opinion that the material had been formed as, and was, quartzite.[1]

---

[1.] Quartz is formed in crevices by the crystalization of silicon dioxide in solution. Quartzite is formed when a similar solution permeates an original sandstone

■■ The District Court, accepting the opinion of the taxpayer's experts, found that the material was quartzite. Whether or not that finding, in a highly technical, geologic or petrologic sense, was correct is not determinative. The District Judge also found, on abundant evidence, that these deposits had long been known as quartzite beds, and that the material was sold, purchased and used as quartzite. He concluded that the material was known in commerce as quartzite and that the depletion statute should be applied in the light of the ordinary, commercial meanings of the terms. In this, we think he was correct.

When the Congress set up depletion schedules for the use of taxpayers extracting minerals and other substances from the earth, it was concerned with articles of commerce. It was with their commercial classification, not their remote geologic origin, that the statute dealt.[2] Indeed, the Commissioner, himself, first construed the statute as warranting an end-use test, under which he treated any quartz rock as quartzite if it was used or sold for use as a refractory, but he treated quartzite as "stone," if it was used or sold for use as stone.[3] The Commissioner, however, acquiesced in the decisions of the Tax Court in Virginian Limestone Corporation[4] and in Spencer Quarries,[5] and, thereupon, came out with

a revised ruling,[6] that all mined material having certain prescribed properties, which the taxpayer's material has, will be treated as quartzite, though used as stone rather than being put to some other use which could more profitably capitalize upon the special properties of quartzite. He even anticipated the present question by ruling that fragmentary quartzite in sedimentary beds would be treated as quartzite only when extracted and separated from other components of a gravel deposit.[7] The Commissioner has now withdrawn from this portion of his ruling, taking the position that quartzite in fragments the size of gravel is not quartzite but gravel.[8]

The principal contention of the Commissioner here is in support of this new position. Essentially, this position is that the classifications of the statute are mutually exclusive. Particularized, he urges us to hold that any material, whatever its chemical or mineralogical properties, may be classified only as gravel if broken or eroded into fragments within the size classification of gravel. Reliance is squarely upon an extension of South Jersey Sand Co. v. Commissioner, 3 Cir., 267 F.2d 591.

When Congress was called upon to classify products of mines and quarries for depletion purposes, it relegated the meaner ones to the lower rates.[9] Ob-

---

and the silica cements and firmly bonds together the previously loosely joined grains of sandstone. In time, the sandstone grains may become metamorphosed, so that the material is largely silicon dioxide, chemically indistinguishable from material removed from veins of quartz. Viewed in the field in the place where it was formed, experts can readily distinguish quartz from quartzite. Elsewhere, the nature of associated materials and miscroscopic examination of the granular structure furnish diagnostic aids, but here produced no unanimity of opinion.

2. Senate Rep. No. 781, 82d Congress, 1st Sess. pp. 37–38; Commissioner of Internal Revenue v. Quartzite Stone Company, 10 Cir., 273 F.2d 738; South Jersey Sand Company v. Comissioner, 3 Cir., 267 F.2d 591; United States v. Wagner Quarries Company, 6 Cir., 260 F.2d 907.

3. Rev.Rul. 54–443, C.B. 1954–2, 164. In this case be allowed the claim for refund to the extent it was based upon sales to refractory and similar industries, but denied it to the extent it was based upon sales to railroads, highway departments and the construction trades.

4. Virginian Limestone Corporation v. Commissioner, 26 T.C. 553.

5. Spencer Quarries, Inc. v. Commissioner, 27 T.C. 392.

6. Rev.Rul. 57–584, C.B. 1957–2, 898.

7. The taxpayer's material has been thus separated and extracted.

8. T.I.R. No. 183, Oct. 28, 1959.

9. § 114(d) (4) (A) of the 1939 Code as finally amended by the Revenue Act of

viously, however, the intention was to allow the higher rates to materials which were rare or qualitatively adaptable to higher uses. This is apparent from an internal view of the statute. "Metallurgical grade limestone" is listed under Par. (iii), which carries a 15% depletion rate. It is hardly to be contended that such limestone is not "stone" within the meaning of Par. (i), which carries a depletion rate of 5%.

The intention of the Congress is not manifest alone in the internal evidence. In the Conference Report,[10] it was stated:

"Under the conference agreement calcium carbonates are granted an allowance of 10 per cent, while marble, which is a calcium carbonate, receives 5 per cent. It is intended, in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification."

Applying this declared purpose, it follows that, as dolomite carries a 10% depletion rate though it be stone which, itself, carries a depletion rate of 5%,[11] so also the extractor of quartzite is entitled to a 15% depletion allowance though it be in fragments of a size which warrants its classification as gravel.

"Gravel" and "sand" are only terms of size. The fragmented product of any quarry, however precious, may be gravel or sand if the size of the fragments is within the range of the accepted definitions of those terms. If the fragments are so large that they cannot be properly classified as gravel, it is stone, which has a depletion rate of 5%. It seems plain that Congress did not intend a general term such as "gravel," which when applied to a rocky substance is descriptive only of the size of the fragments into which it is broken, to govern rather than a more specific classification according to the nature and quality of the material.

So far as appears, quartzite is in commercial demand only in relatively small fragments. Typically, one of the industrial purchasers of the taxpayer's product specified the size as 3½" x 1". Rock in such a size is gravel. If the taxpayer had been working a massive, original deposit of quartzite, he would have been required to break it up into fragments of such size in order to sell it. In that event, the Commissioner seems to concede he would be entitled to depletion for quartzite. The taxpayer is fortunate that nature had performed the fragmentation for him, but the fragmented material is still quartzite.

In South Jersey Sand Company v. Commissioner, 3 Cir., 267 F.2d 591, it was held that a silica sand was not quartzite.

1951, c. 521, 65 Stat. 452, provides depletion allowances, as follows:

"(4) *Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits*

"(A) *In general.* The allowance for depletion under section 23(m) in the case of the following mines and other natural deposit shall be—

"(i) in the case of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine, 5 per centum,

"(ii) in the case of coal, asbestos, brucite, dolomite, magnesite, perlite, wollastonite, calcium carbonates, and magnesium carbonates, 10 per centum,

"(iii) in the case of metal mines, aplite, bauxite, fluorspar, flake graphite, vermiculite, beryl, garnet, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ball clay, sagger clay, china clay, phosphate rock, rock asphalt, trona, bentonite, gilsonite, thenardite, borax, fuller's earth, tripoli, refractory and fire clay, quartzite, diatomaceous earth, metallurgical grade limestone, chemical grade limestone and potash, 15 per centum, and

"(iv) * * *." 26 U.S.C.A. § 114(d) (4) (A).

10. H.R.Rep. 1213, 82d Cong., 1st Sess., p. 77, 1951-2 C.B. 630.

11. Blue Ridge Stone Corporation v. United States, D.C.W.D.Va., 170 F.Supp. 569.

There the testimony of the one witness, who said that the sand was quartzite, was found unsatisfactory, but decision rested principally upon the premise that the terms "sand" and "quartzite" were mutually exclusive. As we have indicated, however, Congress realized a given material might fall within more than one classification, intending the more specific to govern. We think quartzite is more specific as a classification than the general terms which suggest no more than the size of the fragments into which the material is broken. At least on this record, unlike that in South Jersey Sand Co., where there is persuasive evidence that the entire deposit is known as quartzite, it was properly classified as such for depletion purposes.

Affirmed.