**VULCAN MATERIALS COMPANY,**
Plaintiff-Appellant,

v.

**Ernest J. SAUBER, District Director of Internal Revenue, and D. J. Luippold, Acting District Director of Internal Revenue, Defendant-Appellee.**

No. 13565.

United States Court of Appeals
Seventh Circuit.

June 25, 1962.

Rehearing Denied July 27, 1962.

Austin L. Wyman, Stella Clinton, Chicago, Ill., Lee C. Bradley, Jr., Birmingham, Ala., Cummings & Wyman, Chicago, Ill., for plaintiff-appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Kenneth E. Levin, Attorney, Tax Division, U. S. Department of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., Chicago, Ill., Lee A. Jackson, Melva M. Graney, Attorneys, Department of Justice, Washington, D. C., for appellee.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This is an appeal from a decision of the District Court denying a refund of income taxes paid under protest pursuant to deficiency assessments of the Director of Internal Revenue for the years 1951 and 1952 against taxpayer, Vulcan Materials Company,[1] a New Jersey corporation doing business in Illinois. During these years taxpayer owned and operated stone quarries at three locations, one near Racine, Wisconsin, one at McCook, Illinois, and the third at Bellwood, Illinois.

The question presented concerns the proper depletion rates to be allowed taxpayer for the stone quarried at these locations. The applicable statute is Section 114(b) (4) (A) of the Internal Revenue Code of 1939, 26 U.S.C. § 114 (b) (4) (A), as amended by the Revenue Acts of 1942 and 1951.[2]

In the proceeding in the District Court the parties stipulated that the chemical analysis of the stone from each of the quarries for the years in question reveals the following mineral content:

|  | McCook | Racine | Bellwood |
|---|---|---|---|
| Magnesium carbonate | 43% | 43% | 40% |
| Calcium carbonate | 55% | 55% | 53% |
| Impurities | 2% | 2% | 7% |

It was also stipulated that the stone from all the quarries was dolomite and that the McCook and Racine stone was commonly known as such; further, that the stone from these two quarries was suitable for use in the chemical and metallurgical industries, but that the stone from the Bellwood quarry was not.

In its income tax returns for the years 1951 and 1952 taxpayer claimed a depletion deduction of 15% of all sales from the three quarries. The District Director upon an audit of the returns allowed depletion rates of 15%, 10%, and 5% depending upon the actual use to which the quarried stone was put.

The amount of the refund requested by taxpayer was $383,341.67. The District Court determined (1) that the District Director improperly employed the "end use" test in computing the assessments,[3] and (2) that instead of a 15% depletion allowance claimed by taxpayer, it was entitled to a 10% allowance on the sales from the McCook and Racine quarries based on its finding that the stone from these quarries was dolomite and not chemical or metallurgical limestone, and a 5% allowance on the sales from the Bellwood quarry based on its finding that the stone from this quarry was stone and not dolomite. As a result of these determinations the court allowed a partial refund in the amount of $100,210.11. Taxpayer appeals from the denial of a larger refund, claiming that in addition to the amount allowed by the District Court it is entitled to an amount to be computed on the basis of a 10% depletion allowance on the Bellwood sales and a 15% allowance on the McCook and Racine sales.

Both in its tax returns and in the proceeding in the District Court, taxpayer

1. Prior to this suit, original taxpayer, Consumers Company, had merged with Union Chemical & Materials Corporation, which in turn became merged into Vulcan Materials Company.

2. Section 114(b) (4) (A) provides in part that the allowance for depletion shall be:
   "(i) in the case of * * * stone * * * 5 per centum,
   (ii) in the case of * * * dolomite, magnesite, * * * calcium carbonates, and magnesium carbonates, 10 per centum,

   (iii) in the case of * * * metallurgical grade limestone, chemical grade limestone * * * 15 per centum * * * of the gross income from the property during the taxable year * * *."

3. The government conceded that a portion of the assessment attributable to the employment of the "end use" test was refundable under the holding in Virginian Limestone Corp. v. Commissioner, 26 T.C. 553.

claimed that the stone from all three quarries met the requirements of metallurgical grade limestone, thereby entitling it to a 15% depletion allowance. It now concedes, however, that the stone from the Bellwood quarry does not meet the requirements of metallurgical grade limestone, but does claim that this stone is dolomite, thereby entitling it to a 10% allowance.

## I.

The District Court found that the commonly understood commercial meaning of dolomite is a stone containing no more than 5% impurities and at least 40% magnesium carbonate; that chemical and metallurgical grade limestone is a stone of relatively high calcium carbonate content; and that the stone taken from the McCook and Racine quarries was commercially understood to be dolomite. The court therefore concluded that this stone should be classified as dolomite under paragraph (ii) of Section 114(b) (4) (A) rather than as chemical or metallurgical limestone under paragraph (iii) of the Section.

Taxpayer contends that the District Court erred in ruling that the mineral terms enumerated in Section 114 (b) (4) (A) should be given their commonly understood commercial meaning. It also contends that since it was stipulated that the stone from the McCook and Racine quarries is suitable for use in the chemical and metallurgical industries and since some of the product from these quarries was so used,[4] all of its stone from these quarries should be classified as metallurgical grade limestone.

Taxpayer's contention that the court erred in ruling that the classification of the minerals listed in the statute is governed by their commonly understood commercial meaning cannot be sustained. It is true that the statute contains no definitions of the mineral terms therein listed. Its legislative history, however, indicates the meaning which

Congress intended to attach to them. The Senate Finance Committee [5] which added the provisions now contained in paragraphs (i), (ii), and (iii) of Section 114(b) (4) (A) stated in its report, "The names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning." Not only is the commonly understood commercial meaning test supported by this legislative history, but it has also been given judicial approval in Erie Stone Co. v. United States, 6 Cir., 304 F.2d 331, Blue Ridge Stone Corp. v. United States, D.C., 170 F.Supp. 569, and Virginian Limestone Corp. v. Commissioner, 26 T. C. 553.

On this basis alone, we would be justified in ruling against taxpayer's claim that the stone quarried from its McCook and Racine quarries was metallurgical grade limestone, since it was stipulated "[t]hat the stone in all the quarries involved in this proceeding was dolomite and in the McCook and Racine Quarries *was commonly known as such.*" [Emphasis supplied].

We need not, however, rest our decision on the stipulation and its interpretation, and believe we should not do so because of an additional contention advanced by taxpayer. That contention is this: Limestones are divided into two broad classifications, calcium carbonates and magnesium carbonates; when the content of magnesium carbonate predominates, the stone is known as dolomite; the term dolomite, being a particular kind of limestone, is a more specific term than limestone; calcium carbonate limestone and magnesium carbonate limestone (dolomite) range "in grade" from large amounts of impurities to almost no impurities; there is no common commercial understanding of the term "metallurgical grade limestone;" this term, however, is more specific than the term dolomite because it refers to a high purity carbonate stone

---

4. 35% of McCook in 1951, 24.3% in 1952; 12.75% of Racine in 1951, 7.3% in 1952.

5. S.Rep. No. 781, 82d Cong. 1st Sess., p. 38; 2 U.S.Code Cong. and Admn.Service, pp. 2006, 2008.

suitable for use in the metallurgical industry; since dolomite is only a specific kind of limestone, if a magnesium carbonate limestone (dolomite) meets the test of being suitable for use in metallurgical industry, it becomes a metallurgical limestone and thus is a more specific term than dolomite; the metallurgical industry requires fluxing materials of two kinds, limestone as such and dolomite, provided the impurities are less than 5%; the stone taken from the McCook and Racine quarries contains only 2% impurities and was suitable for use in the metallurgical industry; therefore, taxpayer concludes that the stone sold from these two quarries was actually metallurgical grade limestone which entitles it to a 15% depletion allowance.

■ The District Court found that the commonly understood commercial meaning of dolomite is a stone containing at least 40% magnesium carbonate. It further found that "[d]olomite and chemical or metallurgical grade limestone are separate and distinct rocks. Such limestone is commercially understood to be a high grade calcium carbonate stone, whereas dolomite is known commercially for its high magnesium carbonate content," and that the stone quarried from the McCook and Racine quarries was commercially understood to be dolomite. The evidence supports these findings, although the testimony of the witnesses is conflicting in many respects.

There is evidence to the effect that while it is true that the term "limestone" in its broader sense includes dolomite, yet the term "dolomite" has a definite commonly understood commercial meaning distinguishable from what is meant by "limestone," and that the essential distinguishing characteristic of dolomite is its high magnesium carbonate content, whereas the essential distinguishing characteristic of limestone is its high calcium carbonate content.

Several witnesses from the steel industry testified for the government. Their testimony is to the effect that the common understanding of the term dolomite is a high magnesium stone whereas limestone has a high calcium base; that dolomite and limestone are not the same; and that there is a definite distinction between limestone and dolomite.

The testimony of the scientific witnesses is also to the effect that those who use quarried stone for industrial purposes draw a distinction between the terms "dolomite" and "limestone." For example, one witness testified that limestone of high calcium content and dolomite have different uses; that either limestone or dolomite with more than 5% impurities is not preferably suitable for industry; and that when the magnesium compounds industry orders dolomite with no more than 5% impurities, it knows what it is getting, whereas if it ordered limestone of no more than 5% impurities, it might not get dolomite.

Another scientific witness, called by the taxpayer testified as follows:

" * * * I admit that it [dolomite] is allied to limestones, and that it is a carbonate rock the same as limestone, and that in the broadest sense dolomite can be a kind of limestone, but it is not sufficiently exclusive. Dolomite is a much more specific term than 'limestone.' "

This witness further testified that high grade dolomite which is suitable for chemical and metallurgical uses is not a chemical or metallurgical grade limestone.

We believe the testimony of the witnesses establishes that dolomite is commercially known as a stone with a relatively high magnesium carbonate content and thus, is a more specific term than limestone which in its broader sense may be used to embrace all other carbonate stone.

Taxpayer concedes that dolomite is a more specific term than limestone (used in its broader sense) and that Congress intended that when a mineral is specifically provided for at a stated rate of depletion allowance, the specific provision will govern over the allowance pro-

vided for the more general classification.[6] As heretofore detailed, taxpayer goes a step further, however, and contends that metallurgical grade limestone is a more specific term than either limestone or dolomite since to qualify as a metallurgical limestone the stone must contain less than 5% impurities. Taxpayer has failed to persuade us that this contention is sound.

The trouble with the contention is that taxpayer has jumped from an order of specificity based on chemical content (that is, the type of carbonate which the stone contains) to one based on impurity content. We find it unreasonable to believe Congress intended that the percentage of impurities in the stone should govern its mineral classification, and we have found no evidence that such was the intent of Congress. If taxpayer's argument were valid, then certainly Congress would have provided a classification for chemical or metallurgical grade dolomite to cover situations such as we have here, where dolomite is sufficiently pure to be suitable for use in the metallurgical industry. Since Congress did not provide for this classification we believe that the specific provision provided for dolomite sets the upper limit for the percentage depletion allowance for that stone. We agree with the reasoning of the court in Halquist v. Commissioner, 33 T.C. 304, 322, reversed on another issue, 7 Cir., 291 F.2d 49, where the court held:

"We do not believe it is within our province to assume that Congress intended to include a high-grade dolomite within the classification chemical or metallurgical grade limestone when it specifically granted a 10 per cent rate to dolomite. This would be true even if we accept petitioners' contention that the term 'limestone' is commonly understood to include dolomite and that dolomite with a combined carbonate content of 95 per cent would qualify as a chemical or metallurgical grade limestone. Absent some evidence that Congress intended the latter phraseology to encompass high-grade dolomite and thus overlap the term 'dolomite' specifically used in the 10 per cent category, we will apply the concept stated in the conference report quoted above that when a 10 per cent rate was specifically provided for dolomite, that rate shall apply to all dolomite, whether it could also be classified as stone entitled to a 5 per cent rate, as argued by respondent in Virginian Limestone Corporation, supra, or as chemical or metallurgical grade limestone entitled to a 15 per cent rate, as argued by petitioners here."

Consequently, we hold that the stone from the McCook and Racine quarries was dolomite, was commonly known as such, and was entitled to no more than the 10% depletion allowance which was properly allotted to the stone by the District Court.

## II.

Turning to the issue whether the Bellwood quarry stone is entitled to a 5% depletion rate as stone or to a 10% rate as dolomite, we believe that the District Court erred in not allowing the 10% rate. The court's basic finding on this issue is that, "The commonly understood commercial meaning of dolomite is a stone containing no more than 5% impurities. * * *" We believe that this finding is clearly erroneous.

The District Court found that in order to qualify as dolomite within the commonly understood meaning of the term, the stone must contain at least 40% magnesium carbonate. The Bellwood stone contained this exact percentage of magnesium carbonate, and it was stipulated that the stone was dolomite. It was further stipulated, however, that the Bellwood stone contained

6. H.Conference Rep. No. 1213, 82d Cong., 1st Sess., p. 77; 2 U.S.Code Cong. and Admn. Service, pp. 2121, 2133.

7% impurities and because of this amount of impurities the government contended, and the court found, that although this stone was dolomite, it was not such within its commonly understood commercial meaning.

The government's contention is untenable because it is based on the same faulty reasoning that caused taxpayer's contention to be untenable with regard to the McCook and Racine stone. The government attempts to classify dolomite based on its impurity content rather than on its chemical content despite the overwhelming evidence from the scientific literature and witnesses that a carbonate stone is dolomite if it contains a high percentage of magnesium carbonate.

Four of the government's six witnesses were from the steel industry and all of the government's testimony concerning the effect of impurities on the commercial meaning of dolomite was to the effect that *in the chemical and metallurgical industries* no stone with more than 5% impurities is known as dolomite. It was logical, of course, in establishing that the McCook and Racine stone was not commercially known as chemical or metallurgical grade limestone, that the only government witnesses from industry were from the steel industry because the metallurgical industry would have the best knowledge of the commercial meaning of metallurgical grade limestone. This testimony is not conclusive, however, to the determination whether the Bellwood stone was commercially known as dolomite.

The evidence also shows that the Bellwood stone was used to a sizeable extent as agricultural stone and groundstone, to which uses, according to the scientific literature introduced in evidence, dolomite is adaptable. While it is true that the "end use" test has been consistently rejected by the courts since Virginian Limestone Corp., supra, it would be unrealistic and illogical not to consider the commercial adaptability of the Bellwood stone as its adaptability is indicated by its actual usage. In this regard we are in accord with the following statement of Judge Laramore, speaking for the Court of Claims in H. Frazier Co., Inc. v. United States, 302 F.2d 521:

"To classify minerals solely by their end use is one thing, to reach a reasonable interpretation of what Congress intended is another, even though the latter may be shaped and influenced in some degree by the potential use."

That the Bellwood stone was dolomite as that term is commercially understood, is supported by the decisions of other courts which have dealt with this problem. In Blue Ridge Stone Corp. v. United States, supra, the court said:

"There are certain uses of dolomite for which only dolomite of a particular degree of purity can qualify. Such would be use as a refractory, as a dead-burn flux, and as a source of magnesium. It is, however, a fact that only a small per cent of all the dolomite quarried is used for these purposes, while most of it is used in the construction industry as rip-rap, ballast, or concrete aggregate. In writing the statute providing for the depletion allowance, Congress did not see fit to limit the term dolomite to dolomite of any particular degree of purity.

\* \* \* \* \* \*

"The plaintiff's product does not measure up to the high standard of purity required for use as a refractory. However, the term 'dolomite' has come to have the same commonly accepted meaning in commerce and in industry as it has among geologists, \* \* \*."

In Erie Stone Co. v. United States, supra, Judge McAllister, speaking for the court, said:

"Dolomite, standing alone, may be a 'high grade dolomite,' a term used by the District Court in its opinion,—or a 'low grade dolomite.' If it is a high grade dolomite, it could be used as a fluxstone in a

blast furnace in the manufacture of steel; if a low grade dolomite, it could not be used for such a purpose. Some dolomites can be used for chemical purposes; others cannot be. Moreover, dolomites are classified as: (1) argillaceous (clay) dolomite; (2) siliceous (silica) dolomite; (3) arenaceous (sandy) dolomite; and (4) cherty dolomite. Dolomites are often called magnesian limestones or dolomitic limestones, dependent upon the magnesian carbonate content. Many dolomites are marbles, and are entitled to only a 5% depletion allowance, although a dolomite which is not a marble, is entitled to a 10% depletion allowance, according to the statute. * * *"

Judge Weick, concurring with Judge McAllister that the No. 63 stone should be classified as dolomite with a 10% depletion allowance, stated:

"No. 63 stone which contained carbonates of 61.05 per cent was classified by the District Court, not as dolomite, but as stone and held entitled to the lowest depletion allowance of 5%. In my judgment, since this stone contained more than 50% of the mineral dolomite, it was entitled to a classification as dolomite with a 10% depletion allowance. Blue Ridge Stone Corp. v. United States, 170 F.Supp. 569 (D.C.Va., 1959).

"The fact that the stone contained impurities of 38.25% means simply that it is a low grade dolomite. The statute does not distinguish between high and low grade dolomite. Either grade is entitled to a 10% depletion allowance."

We are in particular agreement with Judge Weick's views in regard to the irrelevancy of the amount of impurities contained in a stone which is otherwise dolomite according to the recognized scientific and commercially accepted tests.

Accordingly, we hold that the Bellwood stone should be classified as dolomite and allowed a 10% depletion rate.

The judgment of the District Court is affirmed in part and reversed in part, and the proceeding is remanded for the purpose of entering judgment consistent with this opinion.