CENTRAL COMMERCIAL COMPANY (SUCCESSOR TO CENTRAL COMMERCIAL INDUSTRIES, INC. AND AFFILIATED CORPORATIONS BY STATUTORY MERGER), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CENTRAL COMMERCIAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 81985, 81986, 90682.   Filed September 3, 1963.

*Harry D. Orr, Jr.*, and *William P. Sutter*, for the petitioner.
*Seymour I. Sherman*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax and, by amendments to answers, made claim for additional deficiencies as follows:

| Docket No. | Year | Deficiency | Additional deficiency |
|---|---|---|---|
| 81985 | 1954 | $72,360.91 | $55,157.69 |
| 81986 | 1955 | 66,085.94 | 44,805.66 |
| 90682 | 1956 | 60,014.99 | 32,955.31 |
| | 1957 | 60,951.48 | 15,958.63 |
| | 1958 | 85,005.00 | 29,180.02 |

The petitioner in its petitions claimed overpayments of $110,000 in Docket No. 81985, $100,000 in Docket No. 81986, and $152,000 in Docket No. 90682.

The parties having entered into stipulations as to the computation of the petitioner's "gross income from the property" and "taxable income from the property" in connection with certain of its quarries and as to the amounts of its percentage depletion deductions for all of such quarries except that at Kremlin, Wis., the only issue remaining for decision is whether the material extracted from the petitioner's Kremlin quarry is "stone," entitling it to compute its depletion deduction at the rate of only 5 percent pursuant to section 613(b)(5) of the Internal Revenue Code of 1954, as determined by the respondent, or whether such material falls within the category "all other minerals," entitling it to compute such deduction at the rate of 15 percent pursuant to section 613(b)(6) of the Code.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is a corporation organized under the laws of the State of Illinois with its principal place of business at Chicago, Ill., and is the successor to Central Commercial Industries, Inc., and affiliated corporations by statutory merger effective December 31, 1954. It filed its income tax returns for the taxable years 1954 to 1958, inclusive, with the district director of internal revenue at Chicago.

The petitioner's principal business activity during the years in question was the mining and production of slate and rock granules which it sold to roofing manufacturers for use as roofing granules in asphalt roofing and siding. It had quarries located at Hampton, N.Y., Castleton, Vt., and Kremlin, Wis. It also maintained a complete granule research laboratory in Northfield, Ill.; product control laboratories at all its granule plants; and a number of test panels in Wheeling, Ill., Poultney, Vt., Bound Brook, N.J., and Miami, Fla., for the purpose of testing the effect of weathering upon various roofing granules developed and produced by it.

The petitioner does not sell the crude product from its Kremlin quarry but employs a number of treatment processes, which are typical in the roofing granule industry, in extracting the crude product and processing it for sale as roofing granules. It quarries the deposit by blasting it from the quarry face. Secondary breakage with a steel drop ball reduces the rock to a size which will fit into a primary crusher. Mechanical shovels lift this broken rock and place it on trucks to be hauled to the primary crusher, which reduces the rock to a size which can be moved on a conveyor belt, ranging from dust to a maximum size of less than 12 inches. The rock is then conveyed by means of a conveyor belt to a secondary crusher which reduces the rock in size to a maximum of 1 inch and dries some of the product to remove moisture. The product is then placed in intermediate storage silos for the purpose of providing surge between the final milling of the rock and the quarrying operation. The rock is reduced to a maximum size of approximately 10 mesh in the case of No. 11 granules by final crushing and sizing through the use of smooth faced rolls. Shaking screens are employed to remove the waste, which amounts to approximately 50 percent of the deposit. Such waste is conveyed by means of conveyors, or as a slurry, to the waste pile. The natural granules are then treated with oil to, among other things, promote adhesion to asphalt and to make them imbed better, and are conveyed to storage silos where they are held preparatory to shipment as natural granules or preparatory to further processing as artificially colored granules. Such artificial coloring is accomplished by applying a pigment to the natural granules, heating the coated granules, and subjecting them to certain additional surface treatments to maintain and provide essential qualities for roofing granules.

Roofing granules used in the manufacture of asphalt roofing serve a weather protection function, by shielding the asphalt coating from water and from the actinic rays of the sun, and an ornamental function, by making possible different colored roofs.

The following specific criteria must be met in a rock deposit intended for the manufacture of roofing granules: It must resist weathering conditions, both mechanical and chemical; it must be adaptable to the coloring process; it must be uniform; it must contain sufficient tonnage; it must have low porosity;it must have low transmission of ultraviolet light; it must be tough; and it must provide equidimensional fracture upon crushing.

Granules to be used in roofing must meet certain quality control tests to evaluate the following properties: Durability of the granule base; size and shape (determined primarily by crushing characteristics of the base rock); initial color on fabrication as well as color permanence on exposure; ability to adhere to asphalt; opaqueness (since ultraviolet light decomposes asphalt and opaque granules protect the roofing from this photochemical reaction); resistance to staining and sooting; and ability to prevent bubbling of the asphalt.

The deposit quarried by the petitioner at its Kremlin quarry is an altered basalt. Basalt is a fine-grained dark igneous rock. It, and certain other dark igneous rocks, such as diabase, diorite, and gabbro, are sometimes referred to as traprock. Igneous rocks were originally formed by the crystallization of hot silicate solutions, such as lava, the grain size being smaller in the case of rocks formed by more rapid cooling. The petitioner's deposit consists of more than 50 percent plagioclase, which is a form of feldspar. It also contains other ferromagnesian minerals, including pyroxene which has been altered to hornblende or amphibole, chlorite, and epidote. Due to this alteration of the pyroxene and the fact that the feldspar in the petitioner's deposit contains less calcium than is usually present in basalt, the petitioner's deposit is mineralogically similar to andesite.[1]

Roofing granules are produced from a number of materials other than basalt, including slate (the material mined by the petitioner at its

---

[1] The following chart shows the relationships, and the differences, between the common igneous rocks (such as granite, andesite, basalt, etc.)

| Grain Size \ Predominant Minerals | Feldspar and Quartz | Feldspar | Feldspar and Ferromagnesian Minerals |
|---|---|---|---|
| Coarse (greater than 2.0 mm.) | Granite | Diorite | Gabbro |
| Medium (from 0.5 mm. to 2.0 mm.) | Microgranite Aplite | Microdiorite | Diabase or Dolerite |
| Fine (finer than 0.5 mm.) | Rhyolite | Andesite | Basalt |

Hampton and Castleton quarries for the production of roofing granules), slag, aplite, greenstone, granite, feldspar, limestone, quartzite, rhyolite, syenite, and diabase, all of which are competitive with each other.[2] However, many commercial stone deposits are not used for the production of granules because they lack one or more of the features which are essential to produce a satisfactory roofing granule. Deposits suitable for the production of roofing granules are of restricted occurrence. Many basalt deposits are not suitable.

Since the requirements, as to both chemical and physical characteristics, which a deposit must meet to qualify for use as roofing granules are more rigid than those which a deposit must meet to qualify for use as riprap, ballast, road material, rubble, concrete aggregates, and for other similar purposes, a deposit suitable for the former use is more valuable than one suitable for the latter.

The term "mineral" technically means a single chemical compound. However, such term commercially is broadly used to include both monomineralic rocks and polymineralic rocks such as granite, basalt, andesite, etc. The commercial meaning of the term "mineral" is much broader than the meaning of the term "stone." Commercially, roofing granules are customarily referred to as mineral granules, irrespective of the deposit material from which they are made, and the asphalt roofing which utilizes these granules is called mineral-surfaced roofing.

Geologically, the term "stone" is not used in reference to a deposit in its natural state. Such deposits are referred to as "rock." Economic geologists consider "stone" as being products produced by the mining and the processing of rock materials. The ordinary commercial understanding of the term "stone" is the material which has been broken loose from the mineral deposits.[3]

---

[2] There are no basic differences in the processes used in producing roofing granules in the industry merely because of differences in the material from which the granules are made.

[3] The parties stipulated that a number of specified publications are standard reference works to which either party might make reference for any purpose. Among these are the following publications of the Bureau of Mines, U.S. Interior Department: Minerals Yearbooks; Mineral Facts and Problems (1960 ed.) ; and A Glossary of the Mining and Mineral Industry (1947 ed.). The publication Mineral Facts and Problems, pp. 794 and 804, states in part:

> While the words *rock* and *stone* are often regarded as synonyms, there is a definite distinction in their commercial meanings. The term *rock* is applied either to a geologic formation in its crude form as it exists in the earth, or in the narrower geologic sense as a naturally formed aggregate or mass of minerals. *Stone* is more properly applied to individual blocks, masses, or fragments that have been taken from their original formations for commercial use. The term *dimension* is applied to natural blocks or slabs that are cut to definite shapes and sizes.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> The term *crushed and broken stone* is applied to irregular large fragments of rock usually mined or quarried and crushed or ground to smaller sizes.

However, Mineral Facts and Problems, pp. 806 and 807, in discussing raw materials for the crushed stone industry, refers to the natural deposits from which crushed stone is quarried as "stone deposits."

In A Glossary of the Mining and Mineral Industry, p. 650, "stone" is defined as follows:

> Concreted earthy or mineral matter. A small piece of rock. Rock or rocklike material for building. Large natural masses of stone are generally called rocks; small or quarried masses are called stones; and the finer kinds, gravel or sand.

The Minerals Yearbook (1956 ed.), and Mineral Facts and Problems (1960 ed.), state that the stone industry has two main branches—dimension stone and crushed and broken stone. The Minerals Yearbooks classify the roofing granule industry under the subheading of the crushed and broken stone industry. The publication Mineral Facts and Problems, p. 807, states that of the amount of crushed stone produced in the United States, 8 percent consists of basalt (traprock), 75 percent consists of limestone, and 6 percent consists of granite, and that the remainder consists of sandstone, marble, shell, calcareous marl, slate, and miscellaneous rocks. The Minerals Yearbooks show that during the years in question an average of approximately 97½ percent, by weight, of the amount of basalt and other traprock sold or used by producers in the United States as crushed stone was for riprap, concrete and roadstone, and railroad ballast, and that the remainder was for fill material, roofing granules, and unspecified uses. Both the Minerals Yearbooks and Mineral Facts and Problems show that relatively small amounts of basalt (traprock) are used as dimension stone.

The petitioner's deposit at the Kremlin quarry would be suitable as crushed stone for such commercial purposes as railroad ballast and roadstone if properly screened to size specifications. There are no essential differences between the operations at the Kremlin quarry, prior to the final process of producing the granules themselves, and the operations in the production of ordinary crushed stone. However, the only product sold by the petitioner from its Kremlin quarry in the years in question was roofing granules, either natural or colored. It did not produce aggregate for built-up roofs. Nor did it use or sell the granules produced by it for use as riprap, ballast, road material, rubble, concrete aggregates, or similar purposes.[4] It did not have suitable equipment at its Kremlin quarry for the production of crushed stone for such purposes; nor did it ever test its altered basalt deposit to determine whether it was suitable for such purposes. There was no market for crushed stone in the vicinity of the petitioner's Kremlin quarry, since there are plentiful deposits of gravel in the area.[5] It was not commercially feasible to sell any of the deposit as crushed rock elsewhere because of the high cost of transportation. Nor was there any market in the Kremlin area for the petitioner's waste material.

The parties have stipulated that solely for the purposes of these proceedings the "first commercially marketable product" for the computation of "gross income from the property" shall be deemed to be

[4] On one occasion when the petitioner needed concrete for a plant expansion project at the quarry, it used gravel located nearby instead of utilizing any of the deposit at the quarry.

[5] The Soo Railroad line which served the petitioner's plant at Kremlin used its own gravel deposit as railroad ballast.

the natural (uncolored) granule at the petitioner's Kremlin quarry and that such "gross income from the property" shall be computed by multiplying for each year the number of tons of granules sold by petitioner from such quarry by the price per ton at which it sold natural No. 11 granules; and that the petitioner's "taxable income from the property" shall be computed by multiplying the per-ton cost and expenses attributable to the process employed to produce natural granules by the total number of tons of granules (both natural and artificially colored) sold by the petitioner and by subtracting the resultant figure from the petitioner's "gross income from the property," with the limitation that such computed taxable income may not exceed its actual taxable income derived from the sale of natural and artificially colored granules.

The following tabulation shows, for each of the years in question, the number of tons of granules (both natural and colored) sold by the petitioner, and the petitioner's "gross income from the property":

| Year | Tons of granules sold | "Gross income from the property" |
|------|----------------------|-----------------------------------|
| 1954 | 93,177 | $899,392 |
| 1955 | 119,324 | 1,084,440 |
| 1956 | 118,585 | 1,136,423 |
| 1957 | 106,472 | 1,053,019 |
| 1958 | 114,468 | 1,119,635 |

In its income tax returns for the taxable years 1952 and 1953 the petitioner took percentage depletion deductions on its deposit at its Kremlin quarry at the rate of 5 percent, stating that the mineral produced was "stone." The petitioner filed a petition with this Court with respect to those years (a previous case, Docket No. 64965, which was settled) in which it stated that its principal business activity was the mining of slate and stone, and referred to its roofing granules produced at the Kremlin quarry as stone granules and its sales as sales of slate and stone.

In its income tax returns for the taxable years 1954, 1955, and 1956 the petitioner claimed percentage depletion deductions on its Kremlin quarry deposit at the rate of 5 percent of its gross income from the property, such deductions amounting to $76,528.94, $95,601.60, and $97,015.83, respectively. In its 1954 and 1955 returns the petitioner stated that the mineral produced was stone, and in its 1956 return it stated that the mineral produced was rock. In its returns for the taxable years 1957 and 1958 the petitioner claimed percentage depletion deductions on such deposit at the rate of 15 percent, such deductions amounting to $148,230.88 and $161,880.71, respectively, stating that the mineral produced was rock.

In the notices of deficiency the respondent allowed percentage depletion on the Kremlin deposit at the rate of 5 percent for each of the years in question. The deficiencies for the taxable years 1954, 1955, and 1956 resulted from adjustments which are not now in controversy. The deficiencies determined by the respondent for the taxable years 1957 and 1958 resulted from similar adjustments, as well as from the reduction of the percentage depletion rate from 15 percent to 5 percent on the Kremlin deposit.

The petitioner's Kremlin basalt deposit is "stone" within its commonly understood commercial meaning and within the meaning of section 613(b)(5) of the Internal Revenue Code of 1954.

OPINION

The only issue remaining for our decision is whether the proper rate to be used in computing the petitioner's allowance for depletion with respect to its basalt deposit at its Kremlin quarry is 5 percent, the rate provided for "stone" by section 613(b)(5) of the Internal Revenue Code of 1954, or 15 percent, the rate provided for "all other minerals" by section 613(b)(6) of the Code.[6]

The petitioner contends that Congress, in using the term "stone" in both the 1939 and the 1954 Internal Revenue Codes, referred to a low-cost bulk material, namely, common crushed stone used for riprap,

---

[6] Section 613 of the Code, as it existed in the taxable years in question, provides in part as follows:

SEC. 613. PERCENTAGE DEPLETION.

(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

(b) PERCENTAGE DEPLETION RATES.—The mines, wells and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

*     *     *     *     *     *     *

(5) 5 percent—

(A) brick and tile clay, gravel, mollusk shells (including clam shells and oyster shells), peat, pumice, sand, scoria, shale, and stone, except stone described in paragraph (6); and

*     *     *     *     *     *     *

(6) 15 percent—all other minerals (including, but not limited to, aplite, barite, borax, calcium carbonates, refractory and fire clay, diatomaceous earth, dolomite, feldspar, fullers earth, garnet, gilsonite, granite, limestone, magnesite, magnesium carbonates, marble, phosphate rock, potash, quartzite, slate, soapstone, stone (used or sold for use by the mine owner or operator as dimension stone or ornamental stone), thenardite, tripoli, trona, and (if paragraph (2)(B) does not apply) bauxite, beryl, flake graphite, fluorspar, lepidolite, mica, spodumene, and talc, including pyrophyllite), except that, unless sold on bid in direct competition with a bona fide bid to sell a mineral listed in paragraph (3), the percentage shall be 5 percent for any such other mineral when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes. For purposes of this paragraph, the term "all other minerals" does not include—

(A) soil, sod, dirt, turf, water, or mosses; or

(B) minerals from sea water, the air, or similar inexhaustible sources.

ballast, road material, rubble, concrete aggregates, or similar purposes, and dimension and ornamental stone; that its basalt deposit does not fall within such category since it is of a higher and more valuable grade suitable for, and used only for, the production of roofing granules; that therefore its deposit does not fall within the 5-percent depletion rate prescribed for "stone" by section 613(b)(5); and that since (as we have found and as to which there is no dispute between the parties) its basalt is a "mineral," it falls within the category of "all other minerals" and is entitled to a depletion rate of 15 percent under section 613(b)(6). The respondent, on the other hand, contends that the petitioner's deposit is "stone" within the meaning of section 613(b)(5).

The petitioner called three expert witnesses who testified, in effect, that a natural deposit, such as the petitioner's basalt deposit, is geologically referred to as a rock deposit or a mineral deposit, and that "stone" has reference to products produced by the mining and processing of rock materials. One of them testified that he would not consider the petitioner's product, roofing granules, as "stone." A geologist employed by the Internal Revenue Service, called by the respondent as an expert witness, testified that the ordinary commercial understanding of the word "stone" is the material which has been broken loose from the mineral deposit. The publications stipulated by the parties as being standard reference works also state that the word "stone" is properly applied to minerals which have been taken from their original formations for commercial use (although one of such publications, Mineral Facts and Problems, in discussing raw materials for the crushed stone industry, refers to the natural deposits from which crushed stone is quarried as "stone deposits"). In any event, it is obvious from the wording of section 613 of the 1954 Code that Congress used the term "stone" in the sense of a natural deposit (whether in the ground or after separation therefrom), as distinguished from a product. Such section specifically deals with "mines, wells and other natural deposits listed in subsection (b)," and subsection (b) specifically includes "stone."

Petitioner, in support of its contention that the word "stone" has consistently been used by Congress in the sense of common crushed stone used for road material, rubble, etc., and for dimension and ornamental stone, refers to the committee reports with respect to the revenue bill of 1951, which first made provision for percentage depletion with respect to "stone." [7] It also refers to section 39.23(m)–5(b) of

---

[7] Section 319 of the Revenue Act of 1951 amended section 114(b)(4)(A) of the Internal Revenue Code of 1939 to provide a list of mines and other deposits entitled to percentage depletion at the rate of 5 percent, which included specifically, among other items, stone, granite, marble, and slate.

In explanation of this new enactment, it was stated, in part, in S. Rept. No. 781, 82d Cong., 1st Sess., pp. 37–38:

The testimony received by this committee both in connection with this bill and the bill which became the Revenue Act of 1950 revealed that in a number of cases non-

Regulations 118 (under the 1939 Code), which defined the term "stone" as "All common dimension, crushed or broken stone within the ordinary meaning of these terms."[8] However, in *United States Gypsum Co.* v. *United States*, (C.A. 7) 253 F. 2d 738, the court, in affirming a District Court decision holding that the taxpayer's deposits of gypsum were deposits of stone within the meaning of section 114(b) (4)(A)(i) of the Internal Revenue Code of 1939, stated that it found nothing in the legislative history of the provision which supported the view that the word "stone" was intended to be used in the restricted sense given it in the building and construction business, and that if the regulation were interpreted to limit the word "stone" to such narrow meaning, it would be unreasonable, void, and of no effect. The court there also stated in part:

Examination of the language of the statute indicates that the Congress when using a word in a narrowly restricted sense used restrictive terminology as "brick and tile clay" in the five per cent classification and "refractory and fire clay" in the fifteen per cent classification. "Stone" is not restricted in meaning by any descriptive term such as "building" stone * * *

Nor do we find anything in section 613 of the 1954 Code or its legislative history[9] which would indicate that Congress used the term "stone" in any such narrow sense as contended for by the petitioner.[10]

metallic minerals which are not in the enumerated group under existing law are competitive with those receiving percentage depletion, or have just as good a claim for such treatment as the enumerated minerals. * * *

* * * * * * *

The names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning. * * *

In Conf. Rept. No. 1213, 82d Cong., 1st Sess., p. 77, it was stated in part:

It is intended, in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification.

It is the intention, in including stone in the 5 percent percentage depletion category, to limit such term to its commonly understood meaning. Thus, depletion would be allowed in the case of common stone which is crushed for use in building roads but would not be allowed in the case of precious stones such as diamonds.

8 The petitioner contends that this regulation was outstanding during all the taxable years here involved and that it was made applicable to such years by T.D. 6091, 1954–2 C.B. 47. In this connection it may be pointed out that T.D. 6091, in prescribing and making applicable to the 1954 Code regulations applicable under any provision of law in effect on the date of enactment of the Code, did so only "insofar as any such regulation is not inconsistent with the Code." When the income tax regulations under section 613 of the 1954 Code were promulgated by T.D. 6446, 1960–1 C.B. 208 (approved January 18, 1960), the definition of "stone" which appeared in the prior regulation was eliminated.

9 S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 77, 78, 331, states in part:

Under the new provisions, depletion allowances, other than those for oil, gas, and sulfur, are divided into two groups: Specific items depletable at 15, 10, and 5 percent and another general class for all other minerals.

* * * * * * *

The specific 5 percent category includes all the items presently listed at 5 percent except those given a higher rate, and in addition the 5 percent class is to include peat and mollusk shells (including clam shells and oyster shells).

Generally, the minerals in the above categories will receive the stated depletion allowance regardless of the way they are used. All other minerals not specifically listed are placed in a general class to receive percentage depletion at the rate of 15 percent, subject to the limitation that if they are used for certain purposes for which crushed stone is commonly used they are to be entitled to a percentage depletion rate of 5 per-

As indicated by Conf. Rept. No. 1213 with respect to the Revenue Act of 1951, Congress referred to "stone" in its commonly understood meaning. The commonly understood commercial meaning of a mineral enumerated for percentage depletion purposes is not necessarily its scientific, geologic, or petrologic meaning. See *Riddell* v. *California Portland Cement Co.*, (C.A. 9) 297 F. 2d 345; and *United States* v. *W. R. Bonsal Co.*, (C.A. 4) 279 F. 2d 465. The determina-

cent. This use test is imposed to prevent discrimination in percentage depletion rates between materials which are used competitively for the same purposes. * * *.

* * * * * * *

Your committee has also modified the treatment of various types of stone. This is done by placing stone in the general class of all other minerals when used, or sold for use as dimension or ornamental stone. * * * Under your committee's bill the 5 percent rate will be applicable to stone when used or sold for use by the mine owner or operator for purposes other than dimension stone and ornamental stone. * * *.

* * * * * * *

In section 613(b)(5) your committee has eliminated granite and marble from the minerals specifically named in the 5 percent category. The effect of this change is to extend to these minerals a 15 percent rate of percentage depletion, except where such minerals are used for the purposes (road material, riprap, etc.) specified in section 613(b)(6), in which case the rate will be 5 percent. Your committee has also amended section 613(b)(5) to provide that stone (unless used or sold for use by the mine owner or operator as dimension stone or ornamental stone) will be entitled to depletion at the 5 percent rate.

H. Rept. No. 1337, 83d Cong., 2d Sess., at pp. 57 and 58, states in part:

In recent years percentage depletion has been granted to 56 classes of nonmetallic minerals: 16 at 5 percent, 8 at 10 percent, and the others at 15 percent of gross income. Many of the classifications have been inexact and there has been uncertainty and controversy as to which gross income rate applies. It is also not clear whether some of the broad classes include nonmetallics not specifically named. A few commercially important nonmetallics are clearly not included in the present classification.

* * * The classes of nonmetallics in the present 15-, 10-, and 5-percent gross income categories were modified somewhat to clarify present law and to provide a grouping that is administratively more feasible and competitively more equitable. Under this revision there are a few increases, but no reductions, in the rates of percentage depletion allowed by present law and regulations.

Under the new provision depletion allowances, other than those for oil, gas, and sulfur are divided into two groups: Specific items depletable at 15, 10, and 5 percent and another general class for all other minerals.

* * * * * * *

The specific 5-percent category includes all the items presently listed at 5 percent except slate which has been raised to the 15-percent class, and in addition the 5-percent class is to include peat and mollusk shells.

All other minerals not specifically listed are placed in a general class to receive percentage depletion at the rate of 15 percent, subject to the limitation that if they are used for the same purposes for which stone is commonly used, they are to be regarded as stone and entitled to a percentage depletion rate of 5 percent. * * *

[10] The petitioner states on brief that even if it is in error with respect to its contention that the term "stone" was used in a narrow sense in the 1939 Code, nevertheless it still contends that such term is narrowly used in the 1954 Code. In support thereof it points out that despite the fact that there is no specific enumeration of gypsum in section 613(b) of the 1954 Code, the 1954 regulations (sec. 1.613-2(b)(4)) provide that the term "all other minerals" as used in section 613(b)(6) includes gypsum. We cannot conclude that this indicates an intention to narrow the term "stone." Whether the respondent, in promulgating such regulations, was justified in treating gypsum as something other than "stone," we are not here called upon to decide. In passing, however, it may be noted that in H. Rept. No. 1337, p. 58, and S. Rept. No. 1622, p. 332, gypsum is specifically referred to as an example of minerals not specifically listed but coming within the general classification of "all other minerals"; and that the reference books do not refer to gypsum as a material used in the stone industry.

It may be added that were the petitioner correct that "stone" is used in section 613 in the claimed narrow sense there would be no necessity for the provision for stone in section 613(b)(5) since section 613(b)(6) would suffice to fix the depletion rate for all stone within the claimed narrow sense.

tion of which of two categories Congress intended a particular deposit to fall within for depletion purposes is a question of law, and with respect thereto the testimony of expert witnesses, while helpful, is not conclusive. See *South Jersey Sand Co.*, 30 T.C. 360, affd. (C.A. 3) 267 F. 2d 591.

The publications which the parties stipulated are regarded as standard reference works include the Minerals Yearbooks, published by the Bureau of Mines, U.S. Department of the Interior, and Mineral Facts and Problems (1960 ed.) also published by the Bureau of Mines. These official publications classify the roofing granules industry under the subheading of the crushed- and broken-stone industry and show that of the amount of crushed stone produced in the United States, 8 percent consists of basalt and other traprocks. They also show that during the years in question an average of approximately 97½ percent, by weight, of basalt and other traprock sold or used by producers in the United States as crushed stone was for riprap, concrete and roadstone, and railroad ballast, and that the remainder was for other purposes, including the production of roofing granules. Also, as pointed out hereinabove, the publication Mineral Facts and Problems, in discussing raw materials for the crushed-stone industry, refers to the natural deposits from which crushed stone is quarried as "stone deposits." We think that these authorities establish that the natural rock deposits, including basalt, used in the crushed-stone industry, including the manufacture of roofing granules, are deposits of "stone" within the commonly understood commercial meaning of that term, and hence within the meaning of that term as used in section 613 of the Internal Revenue Code of 1954.[11] We have therefore concluded that the petitioner's Kremlin basalt deposit is "stone" within the meaning of that section.

As stated, the petitioner contends that since its Kremlin basalt deposit is a mineral, and that since the term "all other minerals" as used in section 613(b)(6) is not limited to the minerals specifically listed, its basalt deposit should be considered as among such "other minerals" entitled to the 15-percent depletion rate.

We cannot concur in this view. It is well established that a provision with respect to a specific classification takes precedence over one with respect to a more general classification. *Spencer Quarries*, 27 T.C. 392; *Riddell* v. *Victorville Lime Rock Co.*, (C.A. 9) 292 F. 2d 427; *Vulcan Materials Co.* v. *Sauber*, (C.A. 7) 306 F. 2d 65, certiorari denied 371 U.S. 912; *W. D. Haden Co.*, 37 T.C. 512, affirmed sub nom.

---

[11] The petitioner's vice president in charge of manufacturing testified that the petitioner was not a member of the crushed-stone association and that it did not consider itself a member of the crushed-stone industry. However, it is to be noted that for the taxable years 1952 to 1955, inclusive, the petitioner claimed depletion on its deposit as "stone." While this, in itself, is not determinative, it does tend to support the conclusion that the petitioner's basalt deposit falls within the commonly understood commercial meaning of "stone."

*W. D. Haden Co.* v. *Commissioner*, (C.A. 5) 321 F. 2d 169; and Conf. Rept. No. 1213, p. 77. The term "stone," while in fact a very broad term, is more specific than the term "all other minerals." Congress, in its reports, consistently referred to the "all other minerals" category as a general class, and the other items and groups, including "stone," as specific items and specific groups. Accordingly, since, as we have held, the petitioner's deposit is "stone" within the meaning of the Code, its depletion rate is governed by the more specific provisions contained in section 613(b)(5).[12]

Section 613(b)(5) includes in the 5-percent category, stone, except stone described in paragraph (6), namely, stone used or sold for use by the mine owner or operator as dimension stone or ornamental stone. Thus, we think it clear on the face of the statute that no stone comes within the general provision of section 613(b)(6) unless used or sold for the stated purpose. To us the committee reports appear to be specific in this respect. Thus, S. Rept. No. 1622 states that the committee "has also amended section 613(b)(5) to provide that stone (unless used or sold for use by the mine owner or operator as dimension stone or ornamental stone) will be entitled to depletion at the 5-percent rate," that stone is placed "in the general class of all other minerals when used, or sold for use as dimension or ornamental stone," and that "the 5-percent rate will be applicable to stone when used or sold for use by the mine owner or operator for purposes other than dimension stone and ornamental stone." Furthermore, section 1.613–2 of the Income Tax Regulations under the 1954 Code (promulgated by T.D. 6446 and made applicable to taxable years beginning after December 31, 1953, and ending after August 16, 1954) provides that the 5-percent rate applies to "stone (except dimension or ornamental stone)" and that "The 15-percent rate is applicable only to stone used or sold for use by the mine owner or operator as dimension stone or ornamental stone."[13] We cannot conclude that this regulation is unreasonable or plainly inconsistent with the statute. See *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496. See also *Brewster* v. *Gage*, 280 U.S. 327.

The petitioner, in support of its argument that its deposit should be considered as being within the term "all other minerals" entitled

---

[12] It may be observed that since all "stone" apparently is "mineral," this argument of petitioner, if carried to its logical conclusion, would require the inclusion of all stone within the category of "all other minerals" within the meaning of section 613(b)(6), and leave nothing to be included within the category of "stone"—as used in section 613(b)(5). Obviously such was not the intention of Congress.

[13] Such regulations provide that:

For purposes of this section, the term "dimension stone" means blocks and slabs of natural stone, subsequently cut to definite shapes and sizes and used or sold for such uses as building stone (excluding rubble), monumental stone, paving blocks, curbing and flagging. For purposes of this section, "ornamental stone" means blocks and slabs of natural stone, subsequently cut to definite shapes and sizes and used or sold for use for making ornaments or statues.

to the 15-percent rate of depletion provided by section 613(b)(6), contends that it was the purpose of Congress to give the same percentage depletion rate to competitive materials. It points out that included among the minerals specifically mentioned in section 613 (b)(6) are certain minerals which might otherwise be considered as "stone," such as granite, limestone, dolomite, quartzite, and marble, and that among such listed minerals are some, such as aplite, feldspar, granite, limestone, quartzite, and slate, that are competitive with the petitioner's basalt in the manufacture of roofing granules.

While it is true, as stated in H. Rept. No. 1337, that Congress "modified somewhat" the existing 15-, 10-, and 5-percent depletion categories "to provide a grouping that is * * * competitively more equitable," and that it otherwise evidenced an intent to attempt to equalize percentage depletion rates for some competitive materials, it did not, except in certain instances not here material, provide that the rate for a particular deposit should depend upon the rate provided for a competing deposit. The petitioner's concern as to its competitive position because of the depletion rate applicable to its deposit is understandable. However, it is not our function to decide upon the reasonableness of rates granted by the statute, but to decide the rate which Congress has fixed for a particular deposit. *W. D. Haden Co.*, *supra*. As stated, we think the rate prescribed for the category in which the petitioner's deposit falls is 5 percent. As pointed out in S. Rept. No. 1622, generally the minerals listed in the various categories are to receive the stated depletion allowance, regardless of the way they are used. This and other courts have consistently held that the end-use test is not determinative in fixing the proper rate of percentage depletion for a given deposit. *Virginian Limestone Corporation*, 26 T.C. 553; *Spencer Quarries*, *supra*, *Vulcan Materials Co.* v. *Sauber*, *supra*; and *W. D. Haden Co.*, *supra*. So also, here, we must reject the end-use test, except to the extent provided in section 613(b)(5) for the purpose of determining whether the petitioner's deposit comes within section 613(b)(5) or whether it comes within section 613(b)(6), namely, whether it was used or sold for use as dimension stone or ornamental stone, which, of course, it was not.[14] We are not here concerned with the use test

---

[14] The petitioner states that in making its contentions it does not employ the end-use test, but that it relies upon the principle enunciated in *H. Frazier Co.* v. *United States*, (Ct. Cl.) 302 F. 2d 521, and cited with approval in *Vulcan Materials Co.* v. *Sauber*, (C.A. 7) 306 F. 2d 65, as follows:

To classify minerals solely by their end use is one thing, to reach a reasonable interpretation of what Congress intended is another, even though the latter may be shaped and influenced in some degree by the potential use.

In the instant case we have, of course, given consideration to the use to which the petitioner's basalt deposit was adaptable and to which it was actually put, but as demonstrated hereinabove such use does not require or justify the conclusion that such deposit falls outside the classification of "stone" as Congress intended to use that term in section 613(b)(5).

provided in section 613(b)(6) which is a test applied to a deposit which otherwise qualifies under that section (which the petitioner's deposit does not) in order to prevent discrimination in percentage depletion rates between materials which are used or sold for use as riprap, ballast, road material, rubble, concrete aggregates, or for similar purposes. See S. Rept. No. 1622, p. 77, and H. Rept. No. 1337, p. 58.

In view of the foregoing, it is our conclusion that the petitioner is entitled to depletion at the rate of 5 percent, under section 613 (b)(5), with respect to its Kremlin basalt deposit.

*Decisions will be entered under Rule 50.*